IN THE COURT OF APPEALS
TWELFTH APPELLATE DISTRICT OF OHIO

| IN RE: | : | CASE NO. CA2021-07-043 |
| :--- | :--- | :--- |
| J.D., et al. | : | O P I N I O N |
| | | 3/28/2022 |
| | : | |
| | : | |
| | : | |
| | : | |


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2007 JH 14628


Stephanie Lape Wolfinbarger, for appellant.

Morris Law Office, LLC, and Timothy Morris, for appellees.


**M. POWELL, P.J.**

{¶ 1}  Appellant ("Father") appeals the decision of the Clermont County Court of Common Pleas denying his motions to modify custody and terminate child support arrearage.

{¶ 2}  Father and Mother had two children together but never married: J.D., born 2004, and M.D., born 2007. On July 13, 2007, Father was granted parenting time with the children and ordered to pay support and maintenance for the children in the amount of

$378.92 per month. On November 27, 2017, Father was sentenced to 24 months in prison after pleading guilty to third degree felony domestic violence.

{¶ 3} Mother passed away on August 23, 2018. On October 12, 2018, the Clermont County Child Support Enforcement Agency (CSEA) filed a motion requesting the juvenile court terminate Father's child support and health insurance orders effective August 28, 2018. The court granted the motion, its order specifying that "Any arrearages due should not be affected." On November 7, 2018, the children's maternal grandparents ("Grandparents"), were awarded legal custody.

{¶ 4} Father was released from prison on June 11, 2019 and released from parole on January 14, 2021. He initially resided with his parents in Vevay, Indiana. He has since resided with his fiancée ("Fiancée"), at her home in Erlanger, Kentucky. At the time of trial, Father and Fiancée were in the process of purchasing the three-bedroom home which they then rented. Father is employed at Elsmere Ironworks and works from 7:00 a.m. to 3:30 p.m. Monday through Friday.

{¶ 5} After his release from prison, Father had parenting time on alternating weekends with Grandparents. Due to concerns for the children's well-being and their care by Grandparents, however, Father filed a motion to modify custody on September 10, 2020. On April 7, 2021, Father filed a motion to terminate his child support arrearage.

{¶ 6} A hearing on Father's motions was conducted in the Clermont County Juvenile Court on June 16, 2021. The evidence indicated that M.D. had completed eighth grade and J.D. had completed eleventh grade. The children have always attended West Clermont schools. School records introduced as evidence indicated that the children's grades were poor, and they each had excessive absences and poor behavior reports. In sixth grade, M.D. had some failing grades and some As and Bs. By seventh grade, he had more failing grades. M.D.'s most recent eighth grade report card showed that he was

earning all Ds and Fs in his classes and had 31.5 absences. J.D.'s school records indicated he had only 0.5 earned credits since beginning high school in 2018, although he is currently enrolled in a credit recovery program. J.D.'s attendance was also poor and worsened during each of the last three school years. J.D. had 20 absences during the 2018-19 school year, 36 absences during the 2019-20 school year, and 72 absences during the 2020-21 school year.

{¶ 7} Text messages between Father and Grandparents indicated that Grandparents experienced difficulty in getting the children to school. Grandparents repeatedly had asked Father to help with getting the children to school and on occasion he drove to Grandparents' home in the morning to assist. Grandparents also expressed frustration with the children, texting Father to "controll [*sic.*] damn kids," get them a "place to tear up" rather than Grandparents' house, and "I am done[. Y]ou file [for custody,] or [J.D.] goes to foster care." Photographs also depict M.D.'s room at Grandparents' residence as full of trash and clutter. Fiancée described Grandparents' home as "cluttered" and "smoky." The evidence also disclosed that J.D. was twice admitted to Children's Hospital for evaluations after threatening self-harm. On each occasion, follow-up mental health treatment was recommended, but Grandparents did not follow those recommendations. Grandparents did report that J.D. obtained a part-time job at McDonalds and that his attitude had since improved as he is saving money to purchase a car. Father has visited regularly with M.D., but J.D. does not regularly visit with Father and as of the time of the hearing had not done so for approximately six months. As of the hearing, J.D. had never been to Father's Erlanger home. Father regularly attends M.D.'s baseball games and practices and testified that he takes M.D. to "every game and every practice."

{¶ 8} In addition to the aforementioned evidence and the testimony of Father, Fiancée, Grandmother, and Grandfather, the juvenile court conducted in camera interviews

with the children. There is nothing in the record that may be explicitly attributed to the interviews. The juvenile court, however, found that the children were fully integrated into Grandparents' home, that Grandparents' home was the only home environment the children had ever known, and that Grandparents were meeting the children's physical and emotional needs and serving as the primary, if not sole source of financial support for the children. The juvenile court acknowledged the children's poor school performances but found that there was no evidence that this began since the children were placed in the legal custody of Grandparents and noted that the children's mother had recently passed away and their father was in prison at the time they were placed with their grandparents.

{¶ 9} Following the hearing, the juvenile court denied Father's motions. Regarding the custody motion, the juvenile court found that Father had not established that there had been a change of circumstances. Father now appeals, raising the following assignments of error.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED IN DENYING FATHER'S MOTION TO TERMINATE CHILD SUPPORT ARREARAGES WHERE THERE WAS NOT ANY EVIDENCE PRESENTED IN OPPOSITION TO FATHER'S MOTION, THE OBLIGEE IS DECEASED, AND THE CHILDREN ARE NOT EMANCIPATED.

{¶ 12} Father first argues that because Mother is deceased, his child support arrearage owing her should have been terminated. "As a child support matter, we review the arrearage payment determination for an abuse of discretion." *In re S.C.*, 12th Dist. Clermont No. CA2019-03-026, 2020-Ohio-233, ¶ 42. "On an abuse of discretion review, 'an appellate court is not free to substitute its judgment for that of the trial judge.'" *Id.* at ¶ 11, quoting *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

{¶ 13} The CSEA's motion requesting the juvenile court terminate Father's child

support payment obligations specified that "Any arrearages due should not be affected." The juvenile court's order granting the motion used the same language, making clear that Father's child support arrearage remained. The juvenile court denied Father's motion to terminate his arrearage with little analysis, stating that,

> The [CSEA] Motion [to terminate Father's child support obligation] specifically requested that "any arrearages due should not be affected." The only reasonable interpretation of this language is that said arrearages were not due and owing to the Mother. The Court, therefore, finds the Father's Motion to be not well taken.

{¶ 14} Father now argues that because the arrearage was never reduced to a judgment and there was never an estate established for Mother following her death, and because the children remain unemancipated, the arrearage should have been terminated because it can only be owed to Mother, who is deceased. In support of this argument, Father cites *In re Estate of Antkowiak*, 95 Ohio App.3d 546 (6th Dist. 1994).

{¶ 15} In *Antkowiak*, the Sixth Appellate District considered whether a child support arrearage was an asset of the decedent's estate or the separate property of the decedent's emancipated child support beneficiary, for whom the child support obligation had been established. The court of appeals held that the beneficiary has a claim to the arrearage superior to that of the decedent's estate. *Id.* at 553–54. The court of appeals qualified its holding, stating that it

> applies only in those cases where the custodial parent has died and only when there is an emancipated beneficiary. A custodial parent who during his or her lifetime wishes to claim arrearages may do so by having the arrearages reduced to judgment. Such judgment would then become part of a deceased custodial parent's estate.

*Id.* at 554. Thus, under *Antkowiak*, the child support beneficiary has a superior claim to the arrearages where the obligee is deceased, the child support beneficiary is emancipated, and the arrearages have been reduced to judgment prior to the obligee's decease.

{¶ 16} This case is unlike *Antkowiak*. It involves a proceeding where the child support obligor (Father) and the children's legal custodians (Grandparents) are the parties. Apparently, Father is not subject to a child support order in favor of Grandparents. Grandparents do not assert any claim upon the child support arrearage in their own right or on behalf of the children.[1] This case does not call upon us to identify who is entitled to the child support arrearage but only to determine if the arrearage should be terminated. As stated in *Antkowiak*, "[u]pon the death of a custodial parent, the question is not whether a support obligation should be avoided, but whether the child-beneficiary has been provided all that is due." *Id.* at 553.

{¶ 17} R.C. 3119.83 provides that, "Except as provided in section 3119.84 of the Revised Code, a court or child support enforcement agency may not retroactively modify an obligor's duty to pay a delinquent support payment." R.C. 3119.84 permits retroactive modification of child support only for the period between filing a motion for modification and a final order on the motion. Termination of an arrearage is a retroactive modification of child support. *See Bonenfant v. Bonenfant*, 12th Dist. Butler No. CA2005-03-065, 2005-Ohio-6037.

{¶ 18} It may be that upon their emancipation, the children will seek to collect the child support arrearage. It may be that a public assistance agency is due the arrearage. In the instant case, however, the juvenile court did not abuse its discretion in denying Father's motion to terminate his child support arrearage. Father's first assignment of error is consequently overruled.

{¶ 19} Assignment of Error No. 2:

{¶ 20} THE TRIAL COURT ERRED IN FINDING THERE WAS NOT A CHANGE OF

---

1. Grandparents stated in their brief that they "have no position with regard to [Father's first assignment of error] and defer to the Court orders with regard to this matter."

CIRCUMSTANCES WHERE THE CHILDREN WERE DOING POORLY IN SCHOOL, THE MEDICAL NEEDS OF THE CHILDREN WERE BEING NEGLECTED, AND CUSTODIAL GRANDPARENTS REPEATEDLY REQUESTED [FATHER] TAKE CUSTODY AND SHOWED AN INABILITY OR UNWILLINGNESS TO CARE FOR THE CHILDREN.

{¶ 21} Father next argues that the juvenile court erred in denying his motion to change custody and designate him custodial parent. He argues that the evidence reflected a change of circumstances, specifically pointing to (1) both children's poor grades and school attendance; (2) Grandmother's failure to follow up with recommended mental health treatment for J.D. after his two psychiatric hospitalizations after he expressed self-harm ideation; (3) the filthy, cluttered environment in Grandparents' home; and (4) Grandparents' expression that they did not want to care for the children.

{¶ 22} "'A trial court has broad discretion in proceedings involving the care and custody of children.'" *Wren v. Hawkins*, 12th Dist. Madison No. CA2021-03-005, 2021-Ohio-3287, ¶ 12, quoting *In re Mullen*, 129 Ohio St. 3d 417, 2011-Ohio-3361, ¶14. Therefore, "the standard of review in custody decisions is whether the trial court abused its discretion." *D.M. v. J.D.*, 12th Dist. Fayette No. CA2016-08-010, 2017-Ohio-4118, ¶ 11. When applying the abuse of discretion standard, we will not substitute our judgment for that of the trial court. *Id.*

{¶ 23} "In determining whether a modification of custody is warranted, the trial court must follow R.C. 3109.04(E)(1)(a)." *Id.* at ¶ 12.[2] Per the statute, a trial court considering a modification of an order allocating parental rights and responsibilities "is required to first find that a change in circumstances occurred to warrant a change in custodianship." *Lykins v. Lykins*, 12th Dist. Clermont No. CA2019-07-060, 2020-Ohio-2769, ¶ 13. Although R.C.

_____

2. R.C. 2151.23(F)(1) directs a juvenile court to exercise its child custody jurisdiction in accordance with R.C. 3109.04.

3109.04 does not provide a definition of the phrase "change in circumstances," it is well established that the phrase is intended to denote an event, occurrence, or situation which has a material and adverse effect upon a child. *Oyedare v. Oyedare*, 12th Dist. Butler No. CA2018-11-221, 2019-Ohio-2794, ¶ 15.

{¶ 24} In denying Father's motion to modify custody, the juvenile court stated that "[t]he major issue cited by [Father] in his case was the academic and behavioral performance of the minor children" but found that "there was no evidence that this downturn in performance occurred since the award of legal custody to [Grandparents]." Certainly, the degree to which the children had poor grades and attendance worsened over the years Grandparents had custody. For instance, in sixth grade (school year 2018-19), M.D. had some failing grades and some As and Bs. By seventh grade (school year 2019-20), he had more failing grades. M.D.'s most recent eighth grade report card (school year 2020-21) showed that he was earning all Ds and Fs in his classes and had 31.5 absences. J.D.'s attendance was also poor and worsened during each of the last three school years. J.D. had 20 absences during the 2018-19 school year when Grandparents were awarded custody, 36 absences during the 2019-20 school year, and 72 absences during the 2020-21 school year.

{¶ 25} Father's evidence regarding the children's school performance began with the 2018-19 school year. Grandparents were awarded custody of the children on November 7, 2018, only a few months after the 2018-19 school year began. As Mother passed away in August 2018, while Father was imprisoned, Grandparents probably had physical custody of the children prior to or soon after the 2018-19 school year began. Father refers to no evidence regarding the children's school performance in years prior to the 2018-19 school year to permit a comparison of the children's school performance prior to the Grandparents being awarded custody which might merit a finding of changed circumstances. Thus, there

is support in the record for the juvenile court's observation that there was no evidence that the children's poor school performance began since the children were placed in the legal custody of Grandparents.

{¶ 26} The juvenile court neither discussed Grandparents' expressions of frustration in caring for the children nor Grandmother's failure to seek follow-up mental health treatment for J.D. The juvenile court heard Grandparents' testimony and could reasonably have believed that they were frustrated at times with the burdens of caring for the children. However, these frustrations do not necessarily support a finding of changed circumstances and a change of custody. We must defer to the juvenile court on this aspect of Father's claims. *See Atkins v. Stevens*, 12th Dist. Clinton No. CA2012-04-009, 2012-Ohio-6177, ¶ 19 ("We are mindful that we must defer to the findings of the trial court because it was best able to view the witnesses and observe their demeanor, and use these observations in weighing the credibility of the testimony").

{¶ 27} Grandmother's failure to seek follow-up mental health treatment for J.D. is concerning. After two psychiatric hospitalizations related to self-harming ideation, follow-up mental health treatment seems to be indicated. However, we do not find that the juvenile court abused its discretion in failing to address this issue in its order. This juvenile court has presided over this case for several years and has great familiarity with it. The juvenile court may also have been relying upon that knowledge which is not apparent from the record of this most recent proceeding.[3]

{¶ 28} In addition to finding there had not been a change of circumstances, the juvenile court also made findings relating to whether a change of custody was in the children's best interest. Pursuant to R.C. 3109.04(E)(1)(a)(iii), these findings would be

---

3. As noted above, the juvenile court interviewed both J.D. and M.D. in camera.

relevant in considering a change of custody only if the juvenile court had first found that there had been a change of circumstances. R.C. 3109.04(E)(1)(a)(iii) provides that when the court finds a change of circumstances,

> The court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, *unless a modification is in the best interest of the child* and * * * [t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

(Emphasis added.) The juvenile court found that the children were "fully integrated into the Grandparents' home, which is essentially the only home environment the children have ever known," and that Grandparents were meeting the children's physical and emotional needs and serving as the primary, if not sole source of financial support for the children. The juvenile court also found that J.D., despite invitation, rarely visits with Father and had not done so since December 24, 2020, as of the time of the June 16, 2021 hearing; J.D. had never been to Father's Kentucky home; the children had always attended West Clermont schools; and J.D. had recently obtained part-time employment and an improved attitude.

{¶ 29} Although none of the foregoing relates to the juvenile court's basis for denying Father's motion for a change of custody (i.e., that Father had not proved that there had been a change of circumstances), it appears the juvenile court implicitly found that a change of custody was not in the children's best interest or that the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. Father does not address this aspect of the juvenile court's judgment. We find that the juvenile court did not abuse its discretion in denying Father's motion for change of custody and overrule his second assignment of error.

{¶ 30} Judgment affirmed.

S. POWELL and BYRNE, JJ., concur.